**GOLDEN GATE HOTEL ASSOCIATION,**
**Plaintiff,**

v.

**CITY AND COUNTY OF SAN FRANCISCO, Tenderloin Housing Clinic, Inc., North of Market Planning Coalition, and Brad Paul, Defendants.**

No. C–91–3386–JPV.

United States District Court,
N.D. California.

June 21, 1993.

See 836 F.Supp. 707 and 18 F.3d 1482.

918

Violet Elizabeth Grayson, Grayson & Topsfield, San Francisco, CA, for plaintiff.

Louise H. Renne, Burk F. Delventhal, and Thomas J. Owen, San Francisco City Attys., San Francisco, CA, for City and County of San Francisco.

Randall M. Shaw and Timothy J. Lee, Tenderloin Housing Clinic, San Francisco, CA, for Tenderloin Housing Clinic, Inc.

Douglas R. Young and Tamar Pachter, Farella Braun & Martel, San Francisco, CA, for North of Market Planning Coalition.

## ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

VUKASIN, District Judge.

### INTRODUCTION

This matter came on regularly for hearing for what were, in essence, cross-motions for summary judgment. Additionally there are before the court four preliminary matters which were raised by the parties: (1) Tenderloin's request for recusal; (2) North of Market's request to certify for interlocutory appeal this Court's prior Order determining ripeness; (3) North of Market's "request" for summary judgment on the grounds that it is an improper party; and (4) Tenderloin's motion for summary judgment on the grounds that plaintiff's claim is time-barred.[1] After considering the file and the moving papers, and hearing oral argument, the court took the matter under submission, and now rules herewith.

### BACKGROUND

Plaintiff Golden Gate Hotel Association, a trade group of San Francisco hotel owners, challenges the constitutionality of the San Francisco Residential Hotel Ordinance (here-

---

**1.** All co-defendants have joined in Tenderloin's second motion.

inafter the "Ordinance"). Plaintiff's first cause of action, which is at issue in the cross-motions for summary judgment, seeks a declaratory judgment that the Ordinance constitutes a facially unconstitutional taking in violation of the fifth amendment to the United States Constitution. Defendants moved for dismissal of this first cause of action, alleging that plaintiff's challenge of the Ordinance was premature. By order dated March 12, 1992, this court denied defendants' request for dismissal of this first cause of action, determining that plaintiff's facial challenge was ripe for judicial review.

Defendant City and County of San Francisco duly enacted the Ordinance. Defendant Brad Paul is the Director of the Mayor's Office of Housing and Community Development. (For the sake of convenience, this Order will hereinafter collectively refer to defendant Brad Paul and defendant City and County of San Francisco as "San Francisco.") Defendants Tenderloin Housing Clinic, Inc. (hereinafter "Tenderloin") and North of Market Planning Coalition (hereinafter "North of Market") are non-profit advocacy groups which purport to represent individuals who have become or may become displaced when residential hotels violate the Ordinance.

## THE ORDINANCE

The stated purpose of the Residential Hotel Ordinance is "to benefit the general public by minimizing adverse impact on the housing supply and on displaced low income, elderly, and disabled persons resulting from the loss of residential hotel units through their conversion or demolition." [2] To accomplish this goal, the Ordinance designates hotel rooms occupied by the same individual for 32 days or more as a "residential unit," and a "residential hotel" is any building containing a "residential unit." In order to convert a residential hotel to, for instance, a tourist hotel, the owner must obtain a permit from the city. The city will grant a permit for conversion only if the owner provides relocation assistance to hotel residents and pro-

vides for the replacement of residential hotel units being converted by one of the following ways: (1) constructing the replacement units, (2) rehabilitating other residential hotel units, (3) constructing or rehabilitating transitional emergency housing, or (4) contributing an "in lieu" fee to the city's preservation fund or a nonprofit housing group in the amount of 80 percent of the construction cost of the number of units converted, plus site acquisition costs. [3]

## PRELIMINARY MATTERS

### A. Tenderloin's Request for Recusal

In its moving papers, defendant Tenderloin requests that this Court disqualify itself on the grounds that statements made by this Court at a prior hearing in another case indicate that this Court is prejudiced against the Residential Hotel Ordinance. As this Court indicated at oral argument, disqualification is inappropriate.

■ First, Tenderloin's request for recusal is not properly before this Court, because: (1) Tenderloin merely included it as an informal suggestion within its motion for summary judgment, rather than as a formal noticed motion in accordance with Local Rule 220–2; and (2) Tenderloin did not properly bring the request pursuant to either 28 U.S.C. §§ 144 or 455 which require the filing in a timely fashion of affidavits stating grounds for bias or impartiality.

■ Second, Tenderloin is guilty of selective reading. At the time when this Court made the so called "biased" comments, this Court specifically made the comments with the stated caveat that: "So far as this Court has been made knowledgeable of the Ordinance, so far as I know about the Ordinance as I sit here today—this is *not* a final opinion or decision, but from what I have seen and heard and read about it, [and] ... so far as the Court is familiar with it today...." Reporter's Transcript at 64, June 27, 1991 hearing. It is clear from a review of the *complete* record that the Court's statements were not

---

2. *See,* San Francisco Administrative Code section 41 *et seq.*

3. The Ordinance does provide for certain limited exemptions and exceptions which are not applicable here.

a final opinion of the Court and do not demonstrate bias.

Therefore, Tenderloin's informal request for recusal is DENIED.

### B. North of Market's Motion for Certification

■ North of Market requests that this court certify its prior order determining ripeness, dated March 12, 1992, for interlocutory appeal. 28 U.S.C. § 1292(b) provides that a district judge, in his discretion, may certify an order not otherwise appealable for interlocutory appeal if "such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." This court declines to exercise such discretion.

First, this court is of the opinion that an immediate appeal from the prior order, at this time, will not materially advance the ultimate termination of this litigation. Before the court now are fully briefed and argued cross-motions for summary judgment. A decision by this court on the cross-motions will more materially advance this litigation, and may moot the question of interlocutory appeal altogether.

Second, a Supreme Court case decided after this court issued its March order further supports this Court's prior Order determining that plaintiff's first cause of action is ripe. In *Yee v. City of Escondido*, ⸺ U.S. ⸺, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), the Supreme Court stated: "petitioners mount a facial challenge to the ordinance. . . . As [that challenge] does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or to the extent to which these particular petitioners are compensated, petitioners' facial challenge is ripe." *Id.* at ⸺, 112 S.Ct. at 1532. Likewise, plaintiff's facial challenge does not depend on the extent of compensation, and is therefore ripe.

Accordingly, North of Market's motion for certification of the prior Order determining ripeness for interlocutory appeal is DENIED.

### C. North of Market's Claim That It Is an Improper Party

■ North of Market has filed a joinder in Tenderloin's opposition to plaintiff's motion for summary judgment and in Tenderloin's motion for summary judgment. In its joinder, North of Market asserts that it is an improper party defendant, and thus is entitled to judgment as a matter of law. North of Market contends that it is only named as a defendant with respect to the causes of action for declaratory relief, which seek declarations regarding the alleged unconstitutionality of various San Francisco ordinances. North of Market contends that declaratory relief is available only against San Francisco, the governing body that enacted the challenged laws, and not against it.

Although North of Market's arguments may seem logical at first glance, its active participation in this litigation belies its assertions that it is not a proper party to this case. North of Market has actively participated in this litigation since its inception by filing the motion to certify (discussed above), by joining in Tenderloin's second motion for summary judgment (also discussed above), by filing numerous briefs in support of the other defendants' motions and in opposition to plaintiff's motion for summary judgment, by requesting a continuance, and by participating in oral argument. Not until now, the eleventh hour, has North of Market brought this issue to the attention of the Court, and only then by way of an informal suggestion, rather than by a properly noticed motion filed and served in accordance with Local Rule 220–2. Due to North of Market's extensive participation in this case, its contention seems unmeritorious; nonetheless, this Court declines to address the merits of an argument not properly before the court.

Therefore, North of Market's informal request for summary judgment, based on its claim to be an improper party, is DENIED.

### D. Tenderloin's Second Motion for Summary Judgment

■ After the parties had fully briefed and argued the cross-motions for summary judgment, and while the motions were under submission, Tenderloin filed a second motion for summary judgment on September 11,

1992, contending that plaintiff's claims are barred by the statute of limitations. Defendants San Francisco and North of Market joined in Tenderloin's motion. Defendants assert that under *De Anza Properties X, Ltd. v. Santa Cruz County,* 936 F.2d 1084 (9th Cir.1991), plaintiff must bring its facial constitutional challenge to the Ordinance under 42 U.S.C. § 1983, and such suit must be filed within one year of the enactment of the Ordinance. As plaintiff's suit was filed more than one year after enactment of the Ordinance, defendants contend that plaintiff's claim is time-barred.

In response, plaintiff moves to strike defendants' motion, contending that defendants already had their chance to assert any affirmative defenses when filing opposition to plaintiff's motion for summary judgment and when filing their own cross-motions for summary judgment.

Whatever the merit of defendants' statute of limitations defense, it will not now be considered by the court. It would be inappropriate for the court to consider further, unrequested briefing on a motion already briefed, argued, and submitted. In the same vein, then, it would be improper for the court, having taken one motion under submission, to consider a new motion that went to the merits of the submitted motion. At bottom here is a sense of fairness; a party should not be given a chance to re-brief one motion by filing a second motion. Defendants' second motion for summary judgment is nakedly an attempt to get another bite of the apple. This court only gives one bite. Accordingly, plaintiff's motion to strike defendants' second motion for summary judgment is hereby GRANTED.

## CROSS–MOTIONS FOR SUMMARY JUDGMENT

### I. The Standard for Summary Judgment

Summary judgment should be granted where it is shown that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In *Celotex,* the Supreme Court made it clear that summary judgment, when appropriate, is a favored method of resolution, and that:

> summary judgment is mandated, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

In addition, the Court emphasized in *Anderson* that, under Fed.R.Civ.P. 56(e), "when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

### II. Overview

The issue before this Court, on what are essentially cross-motions for summary judgment, is whether the Residential Hotel Ordinance, on its face, violates the takings clause of the fifth amendment to the United States Constitution.[4] The takings clause of the fifth amendment provides: "[N]or shall private property be taken for public use, without just compensation." This guarantee of the fifth amendment, that private property shall not be taken for a public use without just compensation, was designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). The question in this case is whether the uncompensated restrictions imposed by the Residential Hotel Ordinance force the hotel owners to bear more than a fair share of obligations which are rightfully those of society as a whole.

---

**4.** Plaintiffs challenge the constitutionality of the Ordinance on its face, as opposed to challenging the constitutionality of the Ordinance as applied.

■ Legislation can constitute an unconstitutional taking in two different ways: (1) a taking by physical occupation; and (2) a taking by regulation. Plaintiff contends that the Ordinance violates the takings clause in both manners. The court will address plaintiff's claims under these distinct categories in turn.

### III. Taking by Physical Occupation

The physical occupation cases delineate a fairly clear standard: "Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. See, *e.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 [102 S.Ct. 3164, 3171, 73 L.Ed.2d 868] (1982)." *Yee v. City of Escondido*, —— U.S. ——, ——, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992).

Defendants argue that the opinion in *Yee* conclusively forecloses any challenge by the plaintiff that the Residential Hotel Ordinance constitutes an unconstitutional taking by physical occupation. This Court disagrees.

*Yee* involved a challenge to the City of Escondido's Rent Control Ordinance as it applied to mobile home parks in conjunction with the California Mobilehome Residency Law, Cal.Civ.Code § 798. The Mobilehome Residency Law limits the basis upon which a park owner can terminate a mobile home owner's tenancy—the park owner may not require the removal of a mobile home when it is sold, nor charge a transfer fee for the sale or disapprove of the purchaser, provided the purchaser can pay rent. Further, park owners in *Yee* were affected by a 1988 local rent control ordinance which set rents back to their 1986 levels and prohibited rent increases without approval of the City Council. Thus, under this combination of laws, mobile home park owners in *Yee* were, in essence, precluded from setting rents or choosing their tenants.

Faced with that factual record, the Supreme Court held that "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Id.* at ——, 112 S.Ct. at 1528 (emphasis in the original). Because the park owners voluntarily rented their land to the mobile home owners, and the Mobilehome Residency Law allows a park owner to change the use of his land, the Court held that no taking by physical occupation occurred. The Court reasoned that:

> [The land owners] voluntarily rented their land to mobile home owners. At least on the face of the regulatory scheme, neither the City nor the State compels [the land owners], once they have rented their property to tenants, to continue doing so. To the contrary, the Mobilehome Residency Law provides that a park owner who wishes to change the use of his land may evict his tenants, albeit with six or twelve months notice. Cal.Civ.Code Ann. § 798.56(g).

*Id.*

In the instant case, as in *Yee*, the land owners voluntarily rented their land to the tenants in the first instance. However, the land owners in this case (unlike those in *Yee*) are denied, for all practical purposes, the freedom to terminate such rentals. Under the Residential Hotel Ordinance, hotel owners can discontinue rentals only by providing for relocation assistance to hotel residents and providing for the replacement of residential hotel units being converted by either (1) constructing the replacement units, (2) rehabilitating other residential hotel units, (3) constructing or rehabilitating transitional emergency housing, or (4) contributing an "in lieu" fee to the city's preservation fund or a nonprofit housing group in the amount of 80 percent of the construction cost of the number of units converted, plus site acquisition costs.

Thus, unlike the laws at issue in *Yee*, the Residential Hotel Ordinance provides that a hotel owner who wishes to change the use of his land may not simply evict his tenants, but must pay a king's ransom in order to discontinue the use of his property as a residential hotel. Even the *Yee* court acknowledged that "[a] different case would be presented were the statute ... to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Yee* at ——, 112 S.Ct. at 1529.

■ "The one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, 'regularly' use, or 'permanently' occupy, space or a thing which theretofore was understood to be under private ownership." Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv.L.Rev. 1165, 1184 (1967), quoted with approval in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In this case, San Francisco, by enacting the Ordinance, has enabled members of the public to "regularly" use and "permanently" occupy property privately owned by the plaintiffs. Through the Residential Hotel Ordinance, San Francisco exercises forced control over the hotel owners' possessory interests in their properties, including the denial of the hotel owners' right to exclude others.

Under the traditional conception of property, the right to exclude has long been recognized as "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979). *See also, Loretto*, 458 U.S. at 435, 102 S.Ct. at 3176 ("[t]he power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights"). Where, as here, the hotel owners are forced to accept the occupation of their properties, the resulting deprivation of property rights is sufficient to constitute a physical taking for which compensation is required under the Fifth Amendment.

In conclusion, this Court finds that, unlike the state and local laws at issue in *Yee*, the Residential Hotel Ordinance, on its face, has effected a per se physical taking because it interferes so drastically with the hotel prop-erty owner's fundamental rights to possess and exclude as to amount to compelled physical occupation.

## IV. Regulatory Taking

Even if the Residential Hotel Ordinance was not found to be a physical taking, it would still be facially invalid because it further constitutes a regulatory taking without just compensation. "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

Since the inception of regulatory takings jurisprudence, "70–odd years" ago, the Supreme Court has avoided the enunciation and application of a "set formula" for determining just how far is too far. *Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). Indeed, one commentator has opined that the distinction between a regulation and a taking has become "the most haunting jurisprudential problem in the field of contemporary land-use law . . . one that may be the lawyer's equivalent of the physicist's hunt for the quark." Haar, Land–Use Planning 766 (3d ed. 1976). The Supreme Court itself has numerous times noted that no reliable test exists for distinguishing a taking from a regulation.[5]

■ What has emerged from the body of Supreme Court regulatory jurisprudence is the abiding notion that each case must be analyzed closely for its own factual nuances. Reference to a past situation where a taking has been found can be instructive, but often not controlling. Nonetheless, several factors have been regularly considered by the Court as particularly significant. These include the following:

---

**5.** *See, e.g., Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 473–74, 107 S.Ct. 1232, 1236, 94 L.Ed.2d 472 (1987) (emphasizing that takings decisions can be reached only after examination of "the particular facts"); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) ("[w]e have never precisely determined those circumstances where land-use regulations amount to takings"); *Penn–Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (takings analysis involves "essentially ad hoc, factual inquiries"); *Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962) ("no set formula to determine where regulation ends and taking begins"). *See also* Tribe, American Constitutional Law § 9–4, n. 2 for these and further references.

a) the character of the governmental regulation;[6]

b) whether the regulation has deprived the property owner of all viable uses of his property;[7]

c) whether the regulation has deprived the owner of his reasonable investment-backed expectations;[8]

d) whether the regulation has deprived the owner of any sticks from his bundle of property rights.[9]

e) whether the regulation substantially advances a legitimate state interest.[10]

In its takings cases, the Court considers the above listed factors within the context of the great purpose behind the just compensation clause: "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). *See also Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 123–125, 98 S.Ct. 2646, 2658–2660, 57 L.Ed.2d 631 (1978).

With these principles of analysis in mind, this court will now perform a factual analysis of the challenged Ordinance.

### A. Character of the Ordinance

The character of the challenged governmental action, as found in the previous section of this Order, is a physical taking. This court finds that the Ordinance so wholly de-

---

**6.** *See, e.g., Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992) (one "discrete categor[y]" of actions regularly held to be a taking are "regulations that compel the property owner to suffer a physical 'invasion' of his property"); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (law requiring landlords to allow television cable companies to emplace cable facilities in their apartments constituted a taking); *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (imposition of navigational servitude upon private marina constituted a taking); *United States v. Causby,* 328 U.S. 256, 265–66, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946) (allowing regular flights low over plaintiff's land deprived plaintiff of use of land as chicken farm and thus constituted a taking).

**7.** *See, e.g., Lucas,* —— U.S. at ——, 112 S.Ct. at 2893 (second discrete category of per se regulatory taking is where "regulation denies all economically beneficial or productive use of land"); *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (law effects a taking if it "denies an economically viable use of his land"); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987) (land-use regulation does not effect a taking if it does not "deny an owner economically viable use of his land").

**8.** *See, e.g., Lucas,* —— U.S. at —— n. 8, 112 S.Ct. at 2895 n. 8 ("as we have acknowledged time and again, '[t]he economic impact of the regulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations' are keenly relevant to takings analysis generally") (quoting *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (regulation's lack of "interference with reasonable investment-backed expectations" dispositive in holding regulation does not constitute a taking); *Kaiser Aetna,* 444 U.S. at 179, 100 S.Ct. at 393 (actions of Hawaii state government led to fruition of expectancies on part of marina builders— "expectancies that ... the Government must pay for before it takes over the management of the landowner's property").

**9.** *See, e.g., Nollan,* 483 U.S. at 831–32, 107 S.Ct. at 3145–46 (court deems it "obvious" that a direct state appropriation of an easement across plaintiff's beachfront property would constitute a taking of plaintiff's right to exclude others—"one of the most essential sticks in the bundle of rights that are commonly characterized as property"— and thus constitute a taking if no sufficient nexus between purpose behind valid building moratorium and purpose behind requiring permit for plaintiff to build); *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) (destruction of one strand in bundle of property rights does not necessarily constitute a taking when owner possesses a full bundle, "because the aggregate must be viewed in its entirety"). *Compare Penn Central,* 438 U.S. 104, 98 S.Ct. 2646 (no single strand totally destroyed, no taking found) *and Agins,* 447 U.S. 255, 100 S.Ct. 2138 (no single strand totally destroyed, no taking found).

**10.** *See, e.g., Lucas,* —— U.S. at ——, 112 S.Ct. at 2897 ("land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' "); *Nollan,* 483 U.S. at 834, 107 S.Ct. at 3147 ("a use restriction may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial government purpose"); *Agins,* 447 U.S. at 260–61, 100 S.Ct. at 2141–42 (zoning regulations limiting land-use to single-family dwellings found to substantially advance legitimate governmental goals, no taking found).

926

stroys the landowner's right to exclude as to amount to a compelled physical occupation of his property. Such a taking, as noted by the Court in *Lucas*, —— U.S. at ——, 112 S.Ct. at 2893, constitutes a per se taking. However, as noted earlier, this court is proceeding in this part of its inquiry into the constitutionality of the Ordinance as if the Ordinance did not constitute a physical invasion. Thus, for the purposes of this analysis, the court will treat the Ordinance as a public program adjusting the benefits and burdens of economic life to promote the common good, thus finding the Ordinance less offensive in character than if it were an actual physical invasion. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659.

*B. Deprivation of All Economically Viable Uses*

The court finds that the Ordinance does not fall within the second category of situations identified by the *Lucas* court as constituting a per se taking, since the Ordinance does not deprive the landowner of all economically beneficial uses. *Lucas*, —— U.S. at ——, 112 S.Ct. at 2893. Here, the landowner is allowed (or compelled) to continue use of his property as a residential hotel. Thus, on its face the Ordinance does not deprive the landowner of all economically beneficial uses.[11]

*C. Deprivation of Reasonable Investment–Backed Expectations* [12]

■ With respect to the third factor identified earlier as particularly significant, the court finds fatal constitutional shortcomings in the Ordinance. Because of the relocation assistance and replacement cost provisions, the significant effects of the Residential Hotel Ordinance are: (1) to require hotel owners to maintain and preserve units as "residential"; and (2) to prohibit hotel own-

ers from altering or demolishing their buildings or converting them to any other use. The Ordinance is constitutionally infirm because its provisions substantially impair the reasonable investment-backed expectations of the hotel owners in two fundamental ways.

First, California law has accorded strong legal recognition and protection to the particular interest in land with respect to which the hotel owners allege a diminution and elimination of value. Specifically, the Ellis Act, codified at § 7060 of the California Government Code, preserves the fundamental right of landlords to go out of the rental business. The California Legislature adopted the Ellis Act in direct response to the California Supreme Court's decision in *Nash v. City of Santa Monica*, 37 Cal.3d 97, 207 Cal.Rptr. 285, 688 P.2d 894 (1984), where the Court held that an ordinance that prohibited conversion or demolition of rental units did not violate state law or constitute a regulatory taking when a landlord received a fair return on his investment. The Ellis Act explicitly overrules *Nash* "so as to permit landlords to go out of business." Cal. Govt.Code § 7060.7. The hotel owners' reasonable investment-backed expectations thus are shaped by California property law and particularly the Ellis Act, just as the marina builder's expectations were shaped by Hawaii state law in *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). There, the Court held that the actions of the Hawaii State government in inducing the plaintiff builders to construct a marina out of formerly unnavigable land led to the "fruition of expectancies" on the part of plaintiffs—"expectancies that ... the Government must pay for before it takes over the management of the landowner's property." *Id.* at 179, 100 S.Ct. at 393.[13] Like the

---

**11.** As applied, however, the Ordinance may result in sufficient deprivation of economically viable use as to run afoul of this constitutional proscription. However, the question of the Ordinance's effect as applied is not now before the court.

**12.** The court acknowledges that analysis of a land owner's reasonable investment-backed expectations normally is performed relative to the challenge of an ordinance *as applied*, rather than relative to a challenge on the ordinance's face. This is due at least partly to the sparsity of the

record usually presented on a facial challenge. Here, the court finds that the record before it lends itself to the following analysis.

**13.** *See also Lucas*, —— U.S. at ——, n. 7, 112 S.Ct. at 2894, n. 7, where the Court suggested that "deprivation of all economically feasible use" is to be measured by comparison of:
(1) diminished value of property (due to effect of the challenged regulation), and
(2) the owner's reasonable expectations—shaped by the State's law of property—with respect to which the owner alleges a diminution in value.

law at issue in *Kaiser Aetna*, the Ordinance here deprives the hotel owners of reasonable expectancies; this factor militates toward requiring just compensation.

The court finds that the hotel owners' reasonable investment-backed expectations are deprived in a second way. When investing in the hotels, the owners reasonably anticipated that their classic property rights—those making up the so-called bundle of rights—would be respected and upheld. As discussed below, these expectations were frustrated. Such frustration, together with the deprivation of the hotel owners' expectation that the Ellis Act would allow them to get out of the residential hotel business, leads this court to find and hold that the Ordinance is unconstitutional because it too severely trenches on the reasonable investment-backed expectations of the hotel owners.

### D. Deprivation of Classic Property Rights

The court turns now to a consideration of the hotel owners' "bundle of rights." Here, it finds that the Ordinance is constitutionally infirm because it significantly deprives the owners of three important strands in their bundle.

First, by effectively preventing hotel owners from altering or demolishing their buildings and converting them to another lawful use, the Ordinance denies the hotel owners of any right to use his property as he sees fit. Any hotel owner who purchased the property solely to turn it into a profitable investment by renovating or replacing existing structures with new ones is effectively deprived of the right to do so.

Second, by designating certain units as "residential" and requiring that those units remain residential (or, alternatively, subjecting the hotel owners to the substantial costs of relocation and replacement), the Ordinance becomes a coerced rental provision, thereby depriving hotel owners of the fundamental right to possess their properties.

Third, this coercion has the effect of requiring owners to rent to specific tenants, i.e. "residential" tenants, whom they might otherwise not wish to rent to, and thus deprives hotel owners of their right to exclude.

Consequently, the court finds that the practical effect of the Ordinance is to abrogate ownership and developmental rights by drastically interfering with the hotel owners' rights to exclude from, to use, and to possess their property. While a law depriving an owner of only one strand within his bundle of rights may not constitute a taking, *Andrus v. Allard*, 444 U.S. 51, 65–66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979), this court holds that here, the deprivation of three important strands—including the right to exclude ("one of the most essential sticks in the bundle," *Nollan*, 483 U.S. at 831, 107 S.Ct. at 3145)—constitutes a taking for which just compensation is due.

### E. Legitimate State Interest

A land-use regulation that does not substantially advance a legitimate state interest runs afoul of the takings clause. *Nollan*, 483 U.S. at 834–35, 107 S.Ct. at 3147. The Supreme Court has held that, although the cases don't elaborate on the point, nonetheless "a broad range of governmental purposes" satisfy the requirement of a legitimate state interest. *Id.*

Here, the stated purpose of the Ordinance is "to benefit the public by minimizing adverse impact on the housing supply and on displaced low income, elderly, and disabled persons resulting from the loss of residential hotel units through their conversion or demolition." This court grants that the problem of homelessness is a lamentable illness of this society, and that relieving that problem is a legitimate state interest. However, the interest stated by the Ordinance—alleviating the problem of homelessness caused by the conversion and demolition of residential hotel units—is too narrow an interest to qualify as legitimate.

Even if the stated purpose of the Ordinance were the broader—and more legitimate—purpose of relieving homelessness in general, the Ordinance would then violate the takings clause because it would lack an "essential nexus" between the purpose and the means chosen to achieve that purpose. *Nollan*, 483 U.S. at 837, 107 S.Ct. at 3148. The Ordinance illogically places the blame for the

social ill of homelessness on the shoulders of residential hotel owners; it singles out a few to bear the costs which should be borne by the many—a constitutionally impermissible governmental act. *Armstrong,* 364 U.S. at 48–49, 80 S.Ct. at 1569. As the New York Court of Appeals held when faced by a similar residential hotel ordinance:

> [Under *Nollan,*] the heavy exactions imposed by [the New York ordinance] must "substantially advance" its putative purpose of relieving homelessness. No such showing of this required close "nexus" has been made. Rather, the nexus between the obligations placed on [residential hotel] property owners and the alleviation of the highly complex social problem of homelessness is indirect at best and conjectural. Such a tenuous connection between means and ends cannot justify singling out this group of property owners to bear the costs required by the law toward the cure of the homeless problem.

*Seawall Associates v. City of New York,* 74 N.Y.2d 92, 544 N.Y.S.2d 542, 552, 542 N.E.2d 1059, 1069 (1989). The same analysis applies with equal force to the case at bar; the Ordinance fails to "substantially advance" the governmental interest in relieving homelessness, and thus requires the payment of just compensation to the landowner. *Nollan,* 483 U.S. at 834, 107 S.Ct. at 3147.

### F. Summary

In accordance with the foregoing discussion, this court finds that the challenged Ordinance is unconstitutional on its face because it too severely trenches on the hotel owners' reasonable investment-backed expectations, it too significantly deprives the hotel owners of three strands of their bundle of property rights, and it fails to substantially advance legitimate state interests. Any of these three reasons alone would convince the court of the Ordinance's unconstitutionality; together, they make its legal infirmity apodictical.

### V. Conclusion

In conclusion, this Court finds that the Residential Hotel Ordinance effects an unconstitutional taking by physical occupation, and an unconstitutional regulatory taking for the reasons stated herein. Plaintiffs, hotel owners, voluntarily provided some low-income housing by operating their properties on a residential basis for a period of time. Rather than commending the hotel owners for their efforts to help low-income individuals, defendant San Francisco enacted the Residential Hotel Ordinance, effectively placing plaintiffs into perpetual servitude by forcing them to remain in the residential rental business and preventing them from changing businesses. Such an ordinance is impermissible under the constitution.

As Justice Scalia so clearly and persuasively stated:

> The traditional manner in which American government has met the problem of those who cannot pay reasonable prices for privately sold necessities—a problem caused by the society at large—has been the distribution to such persons of funds raised from the public at large through taxes, either in cash (welfare payments) or in goods (public housing, publicly subsidized housing, and food stamps). Unless we are to abandon the guiding principle of the Takings Clause that "public burdens ... should be borne by the public as a whole," *Armstrong,* 364 U.S. at 49, 80 S.Ct. at 1569, this is the only manner that our Constitution permits. The fact that the government acts through the landlord-tenant relationship does not magically transform general public welfare, which must be supported by all the public, into mere "economic regulation," which can disproportionately burden particular individuals. Here the city is not "regulating" rents in the relevant sense of preventing rents that are excessive; rather, it is using the occasion of rent regulation (accomplished by the rest of the Ordinance) to establish a welfare program privately funded by those landlords who happen to have ["residential"] tenants.

*Pennell v. City of San Jose,* 485 U.S. 1, 21–2, 108 S.Ct. 849, 862–3, 99 L.Ed.2d 1 (1988) (Scalia, J. concurring in part and dissenting in part).

## ORDER

In accordance with the foregoing discussion, IT IS HEREBY ORDERED THAT:

1. Defendant Tenderloin's request for recusal is DENIED.

2. Defendant North of Market's motion to certify for interlocutory appeal this Court's Order of March 12, 1992 determining ripeness is DENIED.

3. Defendant North of Market's informal request for summary judgment, based on its claim to be an improper party, is DENIED.

4. Plaintiff's motion to strike defendants' second motion for summary judgment (wherein defendants contended plaintiff's claims are time-barred) is GRANTED.

5. Defendants' first motion for summary judgment is DENIED.

6. Plaintiff's motion for summary judgment on its first cause of action is GRANTED.

IT IS SO ORDERED.